United States District Court
Southern District of Texas

**ENTERED**

April 16, 2018

David J. Bradley, Clerk

IN  THE  UNITED  STATES  DISTRICT  COURT
FOR  THE  SOUTHERN  DISTRICT  OF  TEXAS
HOUSTON  DIVISION

| | | |
|---|---|---|
| WILLIAM E. SULAK, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-17-1069 |
| | § | |
| NANCY A. BERRYHILL, | § | |
| ACTING COMMISSIONER OF THE | § | |
| SOCIAL SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND RECOMMENDATION

Pending before the court[1] are Plaintiff's Motion for Summary Judgment (Doc. 12) and Defendant's Cross-Motion for Summary Judgment (Doc. 14).  The court has considered the motions, the responses, the administrative record, and the applicable law.  For the reasons set forth below, the court **RECOMMENDS** that Plaintiff's motion be **DENIED** and Defendant's motion be **GRANTED**.

## I.  Case Background

Plaintiff filed this action pursuant to 42 U.S.C. § 405(g) for judicial review of an unfavorable decision by the Commissioner of the Social Security Administration ("Commissioner" or "Defendant") regarding Plaintiff's claim for disability income under Title II of the Social Security Act ("the Act").

Plaintiff was born on August 2, 1951, and was 60 years old on

---

[1]     This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72.  See Doc. 4, Order Dated Apr. 12, 2017.

the alleged disability onset date of April 5, 2012.[2]  Plaintiff, who completed four years of college, worked as a Department of Public Safety ("DPS") officer from January 1975 to August 2001, a delivery worker at a plant nursery from February 2002 to December 2002, and a hardware store clerk from November 2004 to August 2013.[3]

## A.  **Medical History**

The medical records generally support a history of treatment for multiple sclerosis and atonic bladder[4] with enlargement of the prostate gland.

### 1.  **Multiple Sclerosis**

On February 29, 2012, Plaintiff sought medical treatment from Irena Pankiewicz, M.D., ("Dr. Pankiewicz") for weakness in his right leg.[5]  Magnetic resonance imagings (MRIs) of his brain and lumbar spine indicated a possible diagnosis of multiple sclerosis, which was confirmed by a lumbar puncture.[6]  At a followup visit on March 29, 2012, Plaintiff stated that he had been "doing better," and denied experiencing headaches, vision issues, chest pain,

---

[2]     See Tr. of Admin. Proceedings ("Tr.") 147.

[3]     See Tr. 183.

[4]     An atonic bladder is one that does not empty properly usually due to innervation or chronic obstruction.  See Atonic Bladder, Med. Dictionary for the Health Professions & Nursing (2012), https://medical-dictionary.thefreedictionary.com/atonic+bladder.

[5]     See Tr. 240.

[6]     See Tr. 235.

shortness of breath and weakness.[7]  He was prescribed Copaxone for treatment.[8]

Plaintiff returned to Dr. Pankiewicz on August 2, 2012.[9]  He reported that his symptoms "ha[d] completely resolved," with the exception of some fatigue when he was exposed to sun and heat.[10] He was advised to avoid high-temperature environments.[11]

Plaintiff saw John Wissinger, M.D., ("Dr. Wissinger"), his primary care physician, on August 6, 2012.  He reported some fatigue but stated that the weakness in his right leg had resolved.[12]  Return visits on September 7, 2012, and November 9, 2012, showed no new complaints.[13]  Plaintiff stated that the Copaxone was "working well" and that he was ambulating without difficulty.[14]

On January 8, 2013, Plaintiff returned to Dr. Wissinger and reported that his multiple sclerosis symptoms were unchanged but he had experienced urinary incontinence three to four times in the

---

[7]    See Tr. 235-36.

[8]    See Tr. 235.

[9]    See Tr. 286-90.

[10]   See Tr. 286.

[11]   See id.

[12]   See Tr. 244.

[13]   See Tr. 255-62.

[14]   See Tr. 259.

past month.[15]   He was instructed to return to the clinic in six months.[16]

On February 7, 2013, Plaintiff returned to Dr. Pankiewicz.  He reported no new problems, and stated that he experienced occasional fatigue but no weakness.[17]  Plaintiff denied dysuria and urinary hesitancy and did not complain of urinary incontinence to Dr. Pankiewicz.[18]

Plaintiff returned to Dr. Wissinger on July 15, 2013.  He reported that he was still taking Copaxone for multiple sclerosis, that there was no change in those symptoms, and that he had "gotten disability" and would retire the following month.[19]  He denied experiencing muscle weakness or cramping, heat intolerance and excessive urination.[20]

On August 26, 2013, Plaintiff returned to Dr. Pankiewicz for a routine visit.  He reported experiencing no dizziness, vision problems, weakness, parasthesia, ataxia or any urinary frequency, hesitancy, or incontinence.[21]  Dr. Pankiewicz instructed him to

---

[15]     See Tr. 263.

[16]     See Tr. 266.

[17]     See Tr. 281.

[18]     See Tr. 281-85.

[19]     See Tr. 270.

[20]     See Tr. 271.

[21]     See Tr. 275-76.

return in six months.[22]

On January 14, 2014, Plaintiff returned to Dr. Wissinger for a routine visit.[23]  He reported experiencing urinary incontinence, which the doctor suspected might be related to an enlarged prostate.[24]  Plaintiff was referred to Zachary R. Mucher, M.D., ("Dr. Mucher") for the prostate issue and instructed to return to Dr. Wissinger in three months.[25]

On February 24, 2014, Dr. Pankiewicz recorded that Plaintiff reported no additional symptoms related to multiple sclerosis.[26] The medical note stated that no new weakness or ataxia was present, that Plaintiff's muscle strength was normal and that he denied heat and cold intolerance.[27]  Plaintiff did not mention any urinary issues.[28]

On April 15, 2014, Plaintiff returned to Dr. Wissinger for a check up and reported no new medical issues except swelling in his feet.[29]  He denied muscle weakness, excessive urination and heat

---

[22]     See Tr. 279.

[23]     See Tr. 292-95.

[24]     See Tr. 292.

[25]     See Tr. 295.

[26]     See Tr. 341-45.

[27]     See Tr. 343, 345.

[28]     See Tr. 341-45.

[29]     See Tr. 304-07.

intolerance.[30]  He noted that he had received treatment for the enlarged prostate and was able to sleep at night.[31]

On October 16, 2014, Plaintiff reported fatigue and nighttime urination to Dr. Wissinger but denied weakness, excessive urination and heat intolerance.[32]

On November 12, 2014, Dr. Pankiewicz found Plaintiff's multiple sclerosis symptoms to be stable.[33]  He had no new weakness, parasthesia or other complaints but experienced some fatigue and occasional muscle spasms in his right leg.[34]  He reported no swelling in his extremities and no difficulty walking.[35]  His motor exam was normal.[36]  Plaintiff stated that he was under the care of a urologist and experienced difficulty in urinating and emptying his bladder but no incontinence or increased frequency of urination.[37]

On April 20, 2015, Plaintiff had a six-month checkup with Dr. Wissinger.  He reported that he was catheterizing himself and had

---

[30]    See Tr. 305.

[31]    See Tr. 304.

[32]    See Tr. 311-13.

[33]    See Tr. 338.

[34]    See id.

[35]    See id.

[36]    See Tr. 339.

[37]    See Tr. 338.

fewer bladder problems than reported at last visit.[38]  His condition was found to be otherwise unchanged in all respects.[39]   He denied heat and cold intolerance, excessive urination and fatigue.[40]  Dr. Wissinger noted that Plaintiff had "normal sensation, reflexes, coordination, muscle strength and tone."[41]

On May 12, 2015, Dr. Pankiewicz filled out a Multiple Sclerosis Questionnaire concerning Plaintiff's symptoms and limitations caused by multiple sclerosis.[42]  She checked boxes noting that Plaintiff exhibited the following:  fatigue, balance problems, weakness, unstable walking, spasticity, bladder problems, and heat sensitivity.[43]   Dr. Pankiewicz found that Plaintiff's fatigue was severe enough to "often" interfere with his attention and concentration.[44]

She estimated that Plaintiff could stand one hour, could sit more than two hours and would need to sit for fifteen to twenty minutes every one to two hours.[45]  Plaintiff could walk eight city

---

[38]     See Tr. 393.

[39]     See Tr. 393-96.

[40]     See Tr. 394.

[41]     See id.

[42]     See Tr. 383-87.

[43]     See Tr. 383.

[44]     See Tr. 384.

[45]     See id.

blocks at a time and could lift ten pounds frequently.[46]   Dr. Pankiewicz answered "yes" and "no" to the question whether Plaintiff had significant limitations in performing repetitive fingering and reaching, and she estimated that Plaintiff could grasp items in both hands thirty percent of an eight-hour day, engage in fine motor manipulation with both hands thirty percent of an eight-hour day and reach overhead less than thirty percent of an eight-hour day.[47]

Dr. Pankiewicz found that Plaintiff should not be exposed to extreme heat, high humidity, fumes, odors, dusts, gases, cigarette smoke, solvents/cleaners and chemicals, but could be exposed to extreme cold and perfumes.[48]   Also, according to the doctor, Plaintiff should never climb stairs or ladders.[49]   Dr. Pankiewicz could not predict how often Plaintiff's impairments would require him to miss work, commenting it was "very unpredictable."[50]

On June 1, 2015, Plaintiff returned to Dr. Wissinger. Plaintiff reported some weakness in his right leg, and Dr. Wissinger suggested that he get physical therapy to address the

---

[46]   See Tr. 384-85.

[47]   See Tr. 386.

[48]   See id.

[49]   See Tr. 387.

[50]   See Tr. 386.

issue.[51]  His arm strength was good.[52]  Plaintiff reported that he was still performing intermittent catheterization and planned to undergo a procedure to address urethra blockage.[53]

### 2.  Atonic Bladder

On February 14, 2014, Dr. Mucher heard Plaintiff's complaints of urge incontinence, occasional urinary hesitancy and nocturia.[54] Dr. Mucher prescribed Avodart and Flomax for treatment of the enlarged prostate.[55]  Plaintiff was advised to return in two weeks.[56]

On March 6, 2014, Plaintiff returned to Dr. Mucher and reported that his incontinence symptoms had improved significantly. He was advised to return in one month.[57]  On April 17, 2014, Plaintiff reported that his symptoms had continued to improve since taking the medications.[58]

On November 24, 2014, Plaintiff underwent a urodynamic study and, on December 9, 2014, underwent a cystoscopic exam.[59]  He was

---

[51]     See Tr. 398-400.

[52]     See Tr. 398.

[53]     See id.

[54]     See Tr. 322.  Nocturia is frequent nighttime urination.  See What is nocturia?,  WebMD  (April  2016),  www.webmd.com/multiple-sclerosis/qa/what-is-nocturia.

[55]     See Tr. 326.

[56]     See Tr. 325.

[57]     See Tr. 330.

[58]     See Tr. 333.

[59]     See Tr. 352-54, 361.

diagnosed with an atonic bladder and advised to empty his bladder via catheterization three to four times daily.[60]

On January 13, 2015, Plaintiff returned to Dr. Mucher and was again instructed on the use of catheters four times per day.[61] Plaintiff reported that he was able to catheterize himself without significant difficulty.[62]

On February 10, 2015, Plaintiff reported to Dr. Mucher that he catheterized himself three times a day without difficulty and experienced no nocturia.[63]  Dr. Mucher noted that Plaintiff had atonic bladder with significant benign prostatic hyperplasia ("BPH")[64] and, as Plaintiff's symptoms had significantly improved, Dr. Mucher considered recommending that Plaintiff undergo another urodynamic study to confirm Plaintiff's improvement.[65]

On April 14, 2015, Plaintiff returned to Dr. Mucher and reported that he was catheterizing himself twice a day and voided more consistently during the day with no nocturia.[66]  Dr. Mucher recommended another urodynamic study, noting that if the study

---

[60]    See Tr. 361.

[61]    See Tr. 370.

[62]    See id.

[63]    See Tr. 373.

[64]    BPH is the enlargement of the prostate gland.  See Benign Prostatic Hyperplasia, Mayo Clinic (Dec. 2017), www.mayoclinic.org/diseases-conditions/benign-prostatic-hyperplasia/symptoms-causes/syc20300877.

[65]    See id.

[66]    See Tr. 375.

showed improved detrusor pressure, he would consider a transurethral resection of the prostate ("TURP").[67]

## B.   Application to Social Security Administration

Plaintiff applied for disability insurance benefits on September 5, 2013, claiming an inability to work since April 5, 2012, due to multiple sclerosis.[68]  In the application, Plaintiff explained that he was unable to work between April 5, 2012 and May 20, 2012, but that he returned to work with reduced hours after May 20, 2012, before ending his employment on August 16, 2013.[69]

Plaintiff listed his past work as a DPS officer from January 1975 to August 2001, a delivery worker at a plant nursery from February 2002 to December 2002, and a hardware store clerk from November 2004 to August 2013.[70]  In his most recent job as a hardware store clerk, Plaintiff stocked shelves, cut glass, cut carpet, unloaded delivery trucks, moved bags of soil, mulch and fertilizer, and assisted customers.[71]  Plaintiff averred that his disabilities affected his ability to lift, walk and climb stairs, stating, "I cannot lift nearly what I could lift in the past.

---

[67]    A TURP is a minimally invasive surgical procedure to remove the portion of the prostate that is blocking urine flow.  See Transurethral resection of the prostate (TURP), Mayo Clinic (Dec. 2017), www.mayoclinic.org/tests-procedures/turp/about/pac-20384880.

[68]    See Tr. 147, 182.

[69]    See Tr. 175.

[70]    See Tr. 183.

[71]    See Tr. 190.

Seems anything over 50 [pounds] is too much.  I am going to attempt to walk a mile for MS next month."[72]  He estimated he could walk "maybe" a half mile.[73]  Plaintiff disclosed that he was able to mow and do other yard work for approximately two hours at a time, clean dishes, paint, and perform small electrical and plumbing repairs on his home.[74]

On October 22, 2013, Plaintiff was found to be not disabled at the initial level of review.[75]  The reviewing physician noted that Plaintiff reported no tremors, dizziness, vision problems, paresthesia, or ataxia but had intermittent problems with weakness.[76]  The reviewing physician further found Plaintiff had fluent speech, intact cognition, normal motion, normal sensation, symetric face, no muscle strength loss, normal coordination of finger to nose and heel to shin.[77]  The reviewing physician noted that although Plaintiff's application reported muscle cramps, imbalance and weakness, those complaints were not found in the medical records.[78]  The reviewing physician found that Plaintiff could lift fifty pounds occasionally and twenty-five pounds

---

[72]    See Tr. 202.

[73]    See id.

[74]    See Tr. 199.

[75]    See Tr. 56.

[76]    See Tr. 55.

[77]    See id.

[78]    See id.

frequently, could stand or walk six hours in an eight-hour day and could sit six hours in an eight-hour day.[79]  Although Plaintiff was determined to have some limitations in the performance of some work activities, the disability examiner found that he could perform his past relevant work as a hardware store clerk.[80]

On reconsideration, the SSA again found Plaintiff's medical condition unchanged and that he was still capable of performing his past relevant work.[81]  Plaintiff requested a hearing before an administrative law judge ("ALJ") of the SSA.[82]

## C.  __Hearing__

The ALJ granted Plaintiff's request and scheduled a hearing for July 14, 2015.[83]  Plaintiff, who was sixty-three years old on the date of the hearing, testified by video-conference and was represented by counsel; a vocational expert ("VE") also testified.[84]

Plaintiff stated that in early 2012, he was diagnosed with multiple sclerosis.[85]  At that time he was experiencing fatigue and difficulty walking.[86]  In April 2012, he took a leave of absence for

---

[79]   See Tr. 54-55.

[80]   See Tr. 56.

[81]   See Tr. 61-67, 76-78.

[82]   See Tr. 80.

[83]   See Tr. 110.

[84]   See Tr. 35-49.

[85]   See Tr. 38.

[86]   See id.

approximately a month and then returned to his employment at the hardware store, reducing his hours and performing less strenuous tasks such as stocking light-weight items.[87]  He did not work the cash register.[88]  He quit his employment at the hardware store in August 2013, stating, "I got to the point where I could start drawing social security.  And I said, well, I'm just going to stay at home.  I have a little pension and my social security and I try to make that work."[89]

Plaintiff stated that, at that time, he was had an enlarged prostate that caused urinary incontinence symptoms such as frequent urination at night and leakage during the day.[90]  Plaintiff explained that he had undergone surgery several weeks before the hearing to correct the enlarged prostate.[91]  When asked by the ALJ if the surgery had reduced the incontinence, Plaintiff replied, "As far as that, that's pretty much well taken care of."  Plaintiff was still wearing pads during the healing process due to residual bleeding.[92]  Plaintiff stated that, as a result of the surgery, the doctor had found prostate cancer, which would be monitored going

---

[87]    See Tr. 39-40.

[88]    See Tr. 45.

[89]    See Tr. 41.

[90]    See Tr. 42.

[91]    See id.

[92]    See Tr. 43.

forward.[93]

Plaintiff stated that the only physical symptoms he experienced on a daily basis related to multiple sclerosis were weakness in his legs and heat intolerance.[94]  Plaintiff testified that on a normal day, he walked his dog about four blocks and stayed home with his wife.[95]  He reported no other limitations.

The VE classified Plaintiff's past relevant work as a DPS officer as medium in exertional demand and skilled.[96]  Plaintiff's work as a retail stocker was semi-skilled and performed at the heavy exertional level.[97]  The ALJ asked the VE whether a hypothetical individual who could lift up to fifty pounds, twenty-five pounds occasionally, with limitations of indoor work only and no use of ladders, ropes or scaffolds was able to perform Plaintiff's past relevant work.[98]  The VE responded in the affirmative, explaining that the hypothetical person could perform the work of a DPS officer if the work were confined to indoors.[99]  The VE opined that the hypothetical individual would also be able to perform several indoor jobs at the unskilled level, such as a

---

[93]   See id.

[94]   See id.

[95]   See Tr. 44.

[96]   See Tr. 46.

[97]   See id.

[98]   See Tr. 45-46.

[99]   See Tr. 46-47.

15

packager, kitchen worker and dietary aide.[100]

Plaintiff's attorney posed a hypothetical individual who had more restrictive limitations of only being able to sit continuously for two hours, stand for one hour, lift less than ten pounds with no exposure to extreme heat, high humidity, fumes, odors, cigarette smoke, solvents or cleaners and who required fifteen- to twenty-minute breaks every hour.  The VE testified that Plaintiff's past work would not be available to such a person.[101]  Plaintiff's attorney did not ask whether his proposed hypothetical individual would be able to perform other work.[102]

### D.  **Commissioner's Decision**

On September 2, 2015, the ALJ issued an unfavorable decision.[103] The ALJ found that Plaintiff met the requirements of insured status through June 30, 2017, and assumed that Plaintiff had not engaged in substantial gainful employment since April 5, 2012.[104]  The ALJ recognized the following impairments as severe: multiple sclerosis, atonic bladder and obesity.[105]

The ALJ found that none of these impairments, individually or

---

[100]    See id.

[101]    See Tr. 48.

[102]    See Tr. 48-49.

[103]    See Tr. 20-30.

[104]    See Tr. 20, 22.

[105]    See Tr. 22.

in combination, met or medically equaled the severity of any of the listings in the regulations[106] (the "Listings").[107]  The ALJ specifically found that Plaintiff's manifestation of multiple sclerosis did not meet the applicable Listing because Plaintiff did not have a disorganization of motor function, a visual or mental impairment, or "significant reproducible fatigue of motor function with substantial muscle weakness on repetitive activity, demonstrated on physical examination, resulting from neurological dysfunction in areas of the central nervous system known to be pathologically involved," as required by the Listings.[108]

And, although the medical records made mention of hypertension, the ALJ found that this was not a severe impairment because the records that showed that Plaintiff's hypertension was benign, mild and controlled by medication.[109]  Plaintiff consistently denied shortness of breath, chest pain and edema.[110]

In support of his RFC determination, the ALJ discussed Plaintiff's symptoms and medical treatment for his severe impairments, including the treatment notes concerning multiple sclerosis and atonic bladder, as well as Plaintiff's own reports

---

[106]    20 C.F.R. Pt. 404, Subpt. P, App. 1.

[107]    See Tr. 23.

[108]    See id.

[109]    See id.

[110]    See id.

17

and testimony.[111]   The ALJ thoroughly discussed the diagnosis and treatment of multiple sclerosis, including Dr. Pankiewicz's treatment notes and the Multiple Sclerosis Questionnaire.[112]   The ALJ indicated that he afforded Dr. Pankiewicz's opinion considerable weight except for those expressed in the Multiple Sclerosis Questionnaire, which the ALJ found were not supported by Dr. Pankiewicz's notes or the other medical evidence and were inconsistent with claimant's own reports of his limitations.[113]

The ALJ also noted complaints in January 2013 and January 2014 of urinary incontinence.[114]   The ALJ thoroughly discussed the subsequent treatment for incontinence, nocturia, and atonic bladder, including Plaintiff's reports of significant improvement after medication and his ability to catheterize without difficulty three times per day.[115]

The ALJ noted Plaintiff's explanation that, prior to his diagnosis of multiple sclerosis, he had experienced difficulty walking and fatigue that interfered with his ability to perform heavy work.[116]   The ALJ also acknowledged that Plaintiff returned to

---

[111]     See Tr. 24-28.

[112]     See Tr. 25-28.

[113]     See Tr. 28.

[114]     See Tr. 25-26.

[115]     See Tr. 26-28.

[116]     See Tr. 24.

work after the diagnosis and a period of recovery to lighter duty
and fewer hours but, in 2013, left his job because he reached an
age at which he could draw pension and social security benefits.[117]
Thereafter, as the ALJ noted, Plaintiff experienced weakness in his
legs and heat intolerance but routinely could walk his dog four
blocks.[118]   The ALJ also included Plaintiff's account of the
prostrate problems with urinary frequency and inconsistency, which
was fully alleviated by the surgery in 2015.[119]

While   recognizing   Plaintiff's   medically   determinable
impairments and the alleged related symptoms, the ALJ found that
Plaintiff's degree of intensity, persistence and limiting effects
of the symptoms were "not entirely credible."[120]  The ALJ found that
Plaintiff had the residual functional capacity ("RFC") to lift or
carry fifty pounds occasionally and to lift or carry twenty-five
pounds frequently, to stand or walk six hours of an eight-hour day
and to sit for six hours of an eight-hour day.[121]  The ALJ limited
Plaintiff's work to indoors and found that he could not climb
ladders, scaffolding or ropes.[122]   The ALJ found that Plaintiff's

---

[117]    See id.

[118]    See id.

[119]    See id.

[120]    See id.

[121]    See Tr. 23.

[122]    See id.

obesity contributed to his functional limitations but did not result in limitations beyond those found in the stated RFC.[123]   The ALJ concluded that Plaintiff could perform his past relevant work as a DPS officer and had transferable skills to several medium exertional, unskilled positions such as packager, kitchen worker and dietary aide.[124]   The ALJ found that Plaintiff was not disabled from the alleged onset date through the date of decision.[125]

On September 25, 2015, Plaintiff appealed the ALJ's decision.[126]   On February 6, 2017, the Appeals Council denied Plaintiff's request for review, thereby transforming the ALJ's decision into the final decision of the Commissioner.[127]   After receiving the Appeals Council's decision, Plaintiff timely sought judicial review of the decision by this court.[128]

## II.  Standard of Review and Applicable Law

The court's review of a final decision by the Commissioner denying disability benefits is limited to the determination of whether: 1) the ALJ applied proper legal standards in evaluating the record; and 2) substantial evidence in the record supports the

---

[123]   See Tr. 24.

[124]   See Tr. 29-30.

[125]   See Tr. 30.

[126]   See Tr. 14-16.

[127]   See Tr. 1-6.

[128]   See Doc. 1, Pl.'s Compl.

decision.  Waters v. Barnhart, 276 F.3d 716, 718 (5th Cir. 2002).

## A.  Legal Standard

In order to obtain disability benefits, a claimant bears the ultimate burden of proving she is disabled within the meaning of the Act.  Wren v. Sullivan, 925 F.2d 123, 125 (5th Cir. 1991).

Under the applicable legal standard, a claimant is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment. . . which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(a); see also Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994). The existence of such a disabling impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic" findings.  42 U.S.C. § 423(d)(3), (d)(5)(A); see also Jones v. Heckler, 702 F.2d 616, 620 (5th Cir. 1983).

To determine whether a claimant is capable of performing any "substantial gainful activity," the regulations provide that disability claims should be evaluated according to the following sequential five-step process:

> (1) a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are; (2) a claimant will not be found to be disabled unless he has a "severe impairment;" (3) a claimant whose impairment meets or is equivalent to [a Listing] will be considered disabled without the need to consider vocational factors; (4) a claimant who is capable of performing work that he has done in the past must be found "not disabled;" and (5) if the claimant is unable to perform his previous work as a

> result of his impairment, then factors such as his age, education, past work experience, and [RFC] must be considered to determine whether he can do other work.

Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994); see also 20 C.F.R. § 404.1520. The analysis stops at any point in the process upon a finding that the claimant is disabled or not disabled. Greenspan, 38 F.3d at 236.

## B.   **Substantial Evidence**

The widely accepted definition of "substantial evidence" is "that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion." Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000).  It is "something more than a scintilla but less than a preponderance."  Id.  The Commissioner has the responsibility of deciding any conflict in the evidence. Id.  If the findings of fact contained in the Commissioner's decision are supported by substantial record evidence, they are conclusive, and this court must affirm.  42 U.S.C. § 405(g); Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990).

Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the court overturn it.  Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  In applying this standard, the court is to review the entire record, but the court may not reweigh the evidence, decide the issues de novo, or substitute the court's judgment for the Commissioner's judgment.  Brown v. Apfel, 192 F.3d 492, 496 (5th

Cir. 1999).  In other words, the court is to defer to the decision of the Commissioner as much as is possible without making its review meaningless.  Id.

### III. Analysis

Plaintiff requests judicial review of the ALJ's decision to deny disability benefits.  Plaintiff asserts that the ALJ erred: (1) by failing to include limitations in the RFC resulting from atonic bladder; (2) by failing to assess proper weight to the opinions of Dr. Pankiewicz; and (3) by failing to take into consideration "Plaintiff's stellar work history" in determining credibility.  Defendant argues that the ALJ's decision is legally sound and is supported by substantial evidence.

#### A.  Atonic Bladder

A claimant's RFC is his utmost remaining ability to work despite all of the limitations resulting from each of his impairments.  See Villa v. Sullivan, 895 F.2d 1019, 1023 (5th Cir. 1990); 20 C.F.R. § 404.1545(a)(1).  In evaluating the claimant's RFC, the ALJ is directed by the regulations to consider how the claimant's impairment affects his physical, mental, and other abilities, as well as the total limiting effects of his impairment. See 20 C.F.R. § 404.1545.  The mere mention of a condition in the medical records does not establish a disabling impairment or even a significant impact on that individual's functional capacity.  Cf. Johnson v. Sullivan, 894 F.2d 683, 685 (5th Cir. 1990)(referring to

a diagnosis as only part of the evidence that must be considered).
The regulations provide that the ultimate responsibility for
determining RFC lies with the ALJ.  20 C.F.R. § 404.1527(d)(2); <u>see</u>
<u>also</u> <u>Taylor v. Astrue</u>, 706 F.3d 600, 602-03 (5th Cir. 2012).

Plaintiff complains that, despite determining that his atonic
bladder was a severe impairment, the ALJ erred when he failed to
include any bathroom-related limitations in Plaintiff's RFC.  In
January 2013, Plaintiff first reported experiencing urinary
incontinence, which he did not mention again until January 2014.
In February 2014, Plaintiff saw a urologist for urinary
incontinence, occasional urinary hesitancy, and nocturia.  The
urologist prescribed medication.  Plaintiff did not mention any
urinary issue to Dr. Pankiewicz at an appointment later that month.
At a urology appointment on March 6, 2014, Plaintiff reported that
his symptoms had significantly improved.  On April 17, 2014,
Plaintiff reported that his symptoms had continued to improve.

Plaintiff was not diagnosed with an atonic bladder until
November 2014 and did not commence self-catheterization until after
that time.  At first, he was instructed to catheterize himself four
times per day.  By April 2015, he was only catheterizing himself
twice a day and reported no nocturia.  At the hearing in July 2015,
Plaintiff reported that he had recently undergone surgery to
correct the enlarged prostate and stated that the surgery resolved
his urinary issues.  At that time, he used pads for residual

bleeding.

The ALJ considered and discussed these medical records and the symptoms that Plaintiff reported.  The medical records conclusively demonstrated that Plaintiff's urinary issues were controlled by medication as early as February 2014, immediately after he sought specialized treatment, and, subsequently, resolved by surgery.  See 20 C.F.R. § 404.1529(c) (listing medications and other methods as considerations in evaluating the intensity and persistence of symptoms); cf. Johnson v. Sullivan, 894 F.2d at 686 (indicating that pain alleviated by medication is not disabling).  The evidence does not suggest that, at any time,[129] Plaintiff's incontinence, urinary hesitancy, nocturia, or self-catheterization posed any consistent limitation on his ability to perform work-related activities within an ordinary work setting.  Nothing in the record indicates that lifting, walking, standing, sitting, or any other work-related activities stimulated urinary distress.  Plaintiff's own reports and testimony about his ability to self-catheter without difficulty and ability to use pads for residual bleeding provide substantial evidence that he could manage the symptoms of his atonic bladder without additional or extended work breaks.

Substantial evidence supports the ALJ's decision not to include bathroom-related limitations in Plaintiff's RFC, and the

---

[129]   Plaintiff's symptoms evolved over time and resolved with treatment. At no time did Plaintiff's symptoms require a work limitation.

25

ALJ included all limitations in the RFC that were reasonably supported by the evidence.

### B.  Dr. Paniewicz's Opinions

The ALJ must evaluate every medical opinion in the record and decide what weight to give each.  See 20 C.F.R. § 404.1527(c). Generally, the ALJ will give more weight to medical sources who treated the claimant because they are likely to have a "unique perspective" that is unavailable solely from objective medical findings or isolated examinations.  20 C.F.R. § 404.1527(c)(2); see also Greenspan, 38 F.3d at 237 (quoting Scott v. Heckler, 770 F.2d 482, 485 (5th Cir. 1985)); Soc. Sec. Ruling 96-5p, 1996 WL 374183, at *2 (July 1996).

The ALJ is required to give good reasons for the weight given a treating source's opinion.  20 C.F.R. § 404.1527(c)(2);  Soc. Sec. Ruling 96-2p, 1996 WL 374188, at *5 (July 1996).  The regulations require that, when a treating source's opinion on the nature and severity of a claimant's impairments "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the case record, it is to be given controlling weight. 20 C.F.R. § 404.1527(c)(2); Soc. Sec. Ruling 96-2p, 1996 WL 374188, at *1 (July 1996).  Conversely, "less weight, little weight, or even no weight may be given to the physician's testimony" that is "brief and conclusory, not supported by medically acceptable

26

clinical laboratory diagnostic techniques, or otherwise unsupported by the evidence." Perez v. Barnhart, 415 F.3d 457, 466 (5th Cir. 2005)(emphasis omitted).

When the ALJ does not give a treating physician's opinion controlling weight, he must consider certain factors to determine the weight to give the opinion, including the history of the treatment relationship, the medical evidence supporting the opinion, and the consistency with the remainder of the record. 20 C.F.R. § 404.1527(c)(2). However, the ALJ is only required to consider these factors, not to record in writing every step of the process. 20 C.F.R. § 404.1527(c) ("Unless we give a treating source's opinion controlling weight . . . we *consider* all of the following factors in deciding the weight we give to any medical opinion.")(emphasis added).

Plaintiff takes issue with the ALJ's assignment of less weight to Dr. Pankiewicz's RFC opinion in the Multiple Sclerosis Questionnaire that she completed in May 2015. The ALJ discussed Dr. Pankiewicz's treatment records and her Multiple Sclerosis Questionnaire. The ALJ afforded Dr. Pankiewicz's opinions considerable weight except for those expressed in the questionnaire, which he gave little weight.

The ALJ explained that, other than the questionnaire, the opinion evidence of the treating physicians was supported by medical signs and findings and was consistent with the other

27

evidence.   The ALJ explained that he gave little weight to Dr. Pankiewicz's RFC opinions in the Multiple Sclerosis Questionnaire because they were not supported by her own treatment notes and because they included undocumented limitations that Plaintiff never claimed.   Even so, the ALJ did not reject every limitation suggested by the doctor, including in his RFC determination that Plaintiff should not work in heat or climb ladders, ropes, or scaffolds.[130]   The court finds that the reasons articulated by the ALJ for affording less weight to the Multiple Sclerosis Questionnaire were well reasoned.

Moreover, the record supports the ALJ's weight determination. The medical evidence shows that, after the initial diagnosis of multiple sclerosis and the prescription of Copaxone, Plaintiff's symptoms immediately improved to the point that all symptoms except fatigue when exposed to heat had completely resolved by August 2012.   At no appointment from that point until Dr. Pankiewicz completed the questionnaire did Plaintiff complain of weakness, difficulty walking, or heat intolerance, reporting only occasional fatigue.   The examination results were consistent with Plaintiff's self-reports.   Plaintiff never complained of difficulty lifting, fingering, grasping, manipulating, or reaching.

---

[130]   Dr. Pankiewicz's assessment was internally inconsistent with regard to Plaintiff's ability to stand/walk.   She stated that he could walk eight blocks without resting and that he needed to sit down every one to two hours for fifteen minutes but that he could only stand/walk for one to two hours in an entire workday.   See Tr. 384-85.

Dr. Wissinger's treatment notes during that time also reflected that Plaintiff's symptoms from multiple sclerosis remained unchanged since the significant, initial improvements with medication. His examination results indicated the same. A note from June 2015 was the only time that Plaintiff reported experiencing right-leg weakness, but that note also stated that Plaintiff's arm strength was good.

Additionally, Plaintiff's own testimony contradicts the limitations suggested by Dr. Pankiewicz. In reporting that he was not able to lift as much as he had in the past, Plaintiff stated that fifty pounds sounded too heavy, compared to Dr. Pankiewicz's ten-pound limitation. Plaintiff estimated he could walk half a mile but was planning to attempt to walk twice that. He also reported that he was capable of mowing and other yard work for two hours at a time and capable of dishwashing, painting, and small electrical and plumbing repairs.

The ALJ bore the responsibility of determining whether Dr. Pankiewicz's opinions conflicted with other substantial evidence and, thus, were entitled to less weight. The ALJ did not err in this evaluation. The treatment notes and testimony support the RFC determination, which, in turn, justified the ALJ's reliance on the VE's responses as substantial evidence of Plaintiff's ability to work.

C. **Work History**

When the medical evidence demonstrates that a claimant has "a medically determinable impairment[] that could reasonably be expected to produce [the claimant's] symptoms," the ALJ evaluates the intensity and persistence of the claimant's symptoms to determine how they limit his capacity to work.  See 20 C.F.R. § 404.1529(c).  The ALJ considers all available evidence from both medical and nonmedical sources, including objective medical evidence, information from medical sources, information about the claimant's prior work record, the claimant's statements about his symptoms, and observations of agency personnel and other individuals.  Id.  Factors to be considered include: daily activities; details regarding the location, frequency, and duration of symptoms; precipitating, aggravating, and alleviating factors; treatment; and any conflicts between the claimant's statements and the rest of the evidence.  Id.  The court must give deference to the ALJ's evaluation of the plaintiff's subjective complaints if it is supported by substantial record evidence.  See Villa, 895 F.2d at 1024.

Plaintiff argues that agency policy requires consideration of his "strong work history as part of his credibility analysis" and that the ALJ failed to comply.[131]  Plaintiff argues that an overwhelming number of courts have "reasoned that it is unlikely someone would trade in their productive, and lucrative, work career

---

[131]    Doc. 13, Pl.'s Brief in Support of Summ. J. p. 17.

for the far less lucrative 'career' of receiving disability benefits."[132]

In this case, the ALJ discussed Plaintiff's statements about the intensity and persistence of his symptoms.  The ALJ stated that he did not find Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms [to be] entirely credible for the reasons explained in this decision."[133]  Those reasons included, inter alia, objective medical evidence, information from Dr. Pankiewicz, Plaintiff's reports to doctors, Plaintiff's response to medication, and daily activities.  The ALJ also noted Plaintiff's admission that he stopped working when he aged into social security and other pension benefits, which suggested to the ALJ that Plaintiff left for reasons other than the inability to perform work activities.

The regulation lists prior work history as the type of information to be considered in determining how symptoms limit the capacity to work, not as a credibility factor.[134]  Moreover, nothing requires that the ALJ specifically discuss prior work history, even if lengthy and lucrative.

---

[132]    Id. (citing cases).

[133]    Tr. 24.

[134]    In March 2016, the Social Security Administration issued Social Security Ruling 16-3p, which superseded Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996), and eliminated the term "credibility" from policy guidance to be consistent with the regulations and to "clarify that subjective symptom evaluation is not an examination of an individual's character."  Soc. Sec. Ruling 16-3p, 2016 WL 1119029, at *1 (Mar. 2016).

The court finds no error in the ALJ's failure to discuss Plaintiff's work history and defers to the ALJ's assessment of how Plaintiff's symptoms affected his ability to work.

### IV. Conclusion

Based on the foregoing, the court **RECOMMENDS** that Plaintiff's motion be **DENIED** and Defendant's motion be **GRANTED.**

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically. Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this 16th day of April, 2018.

_____

U.S. MAGISTRATE JUDGE